IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY :
CONSULTANTS, INC.,                :
                                  :
                                  :
              Plaintiff,          :
                                  :
        v.                        : Civil Action No. 06-404-JJF-LPS
                                  :
PALM, INC., et al.,               :
                                  :
              Defendants.         :

## REPORT AND RECOMMENDATION REGARDING
## MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER
## JURISDICTION AND FOR JURISDICTIONAL DISCOVERY

Pending before me are three motions: (i) a Rule 12(b)(1) Motion For Jurisdictional

Discovery And Hearing And To Dismiss For Lack Of Subject Matter Jurisdiction (D.I. 61) filed

by Defendant Kyocera Wireless Corp. ("Kyocera"); (ii) a Motion To Dismiss For Lack Of

Subject Matter Jurisdiction (D.I. 72) filed by Defendants Aiptek International Inc., Aiptek Inc.,

Concord Camera Corp., High Tech Computer Corp., HTC (BVI) Corp., HTC USA Inc., Palm

Inc., Sanyo Electric Co. Ltd., Sanyo North America Corporation, and T-Mobile USA Inc.

(together with Kyocera, "Defendants"); and (iii) a Motion For Leave To File A Surreply In

Further Opposition to Kyocera's Rule 12(b)(1) Motion (D.I. 111) filed by Plaintiff St. Clair

Intellectual Property Consultants Inc. ("St. Clair").  For the reasons discussed, I recommend

denial of Defendants' Motions To Dismiss and for Jurisdictional Discovery and grant St. Clair's

Motion For Leave To File A Surreply.

1

## BACKGROUND

### I.    Procedural Background

St. Clair filed this action against Defendants alleging infringement of United States Patent

Nos. 5,138,459, 6,094,219, 6,233,010, and 6,323,899 (collectively, the "Roberts Patents").

Before Defendants answered the Amended Complaint, St. Clair filed an unopposed motion to

stay the case pending resolution of a dispute in the California state courts between St. Clair and

Eastman Kodak Co. ("Kodak") concerning the ownership of the Roberts Patents.  Judge Farnan

stayed the action, and the parties filed periodic status reports during the pendency of the

California litigation.

Effective May 14, 2008, St. Clair and Kodak reached a settlement in the California

litigation, and the stay in this case was lifted on October 16, 2008.  Shortly thereafter, Defendants

filed the instant Motions To Dismiss contending that St. Clair is not the true owner of the

Roberts Patents (the "ownership defense").

### II.    Factual Background

St. Clair was founded in 1990 by Thomas Baumgarten and Edmund Chung as a

consulting and technology development firm that advises companies about patents and funds

their research into new technologies.  In the early 1990s, St. Clair began working with Personal

Computer Cameras, Inc. ("Personal Computer Cameras"), a company formed by Marc Roberts,

Matthew Chikosky, and Jerry Speasl, the inventors of the Roberts Patents (the "Inventors").

Generally, the Roberts Patents claim a digital camera that allows the formatting of photographic

images in a camera in a choice of file formats, such as TIFF, JPEG and MPEG.

The Inventors assigned the Roberts Patents to their company, Personal Computer

2

Cameras, in 1991, and recorded these assignments with the United States Patent and Trademark Office ("PTO") on January 9, 1992. (D.I. 77, Exh. 2.) St. Clair then began investing in Personal Computer Cameras, loaning the company a total of $45,000 by January 1993.

Despite these investments, Personal Computer Cameras was deeply in debt. According to St. Clair, it could have forced Personal Computer Cameras into bankruptcy by seeking to enforce its loan agreements. Instead, on November 21, 1995, St. Clair and Personal Computer Cameras entered into a Patent Purchase Agreement whereby St. Clair acquired all right, title, and interest in and to the Roberts Patents in exchange for, among other things, a cash payment of $60,000 and payments to Personal Computer Cameras of half of any future revenue from licenses or settlements related to the Roberts Patents.[1]  (*Id.* at Exh. 3, 4.) St. Clair claims that prior to entering into the Patent Purchase Agreement, it conducted due diligence concerning title to the Roberts Patents, including an inquiry into whether the Inventors had employment agreements with their former employers regarding the assignment of the digital camera invention claimed in the Roberts Patents. In particular, St. Clair obtained verification from Mr. Speasl that the Inventors' former employer, Mirage Systems, Inc. ("Mirage"), had no "shop rights" to the patented technology, and that the Inventors had developed the Roberts Patents on their own time using their own resources. St. Clair also confirmed that the invention had been disclosed to Mirage both before and after the issuance of the Roberts Patents.

The ownership defense at issue in the instant Motions first arose in the action captioned *St. Clair v. Canon, et al.*, Civ. Act. No. 03-241-JJF (the *"Canon* Action"). In that action, St.

---

[1]Since acquiring the Roberts Patents, St. Clair has been enforcing its patent rights through the procurement of license agreements and/or the initiation of legal proceedings.

Clair sued eight digital camera manufacturers. Six of the eight defendants entered into settlement agreements that included a license under the Roberts Patents. Two of the defendants, Canon and Fuji, proceeded to trial.

During the summary judgment phase of the *Canon* Action, Canon raised the ownership defense in a Motion to Dismiss for Lack of Standing and Subject Matter Jurisdiction. Canon contended that the Roberts Patents were automatically assigned to the Inventors' former employer, Mirage, based upon their previous Employment Agreements, and, therefore, St. Clair was not the true owner of the Roberts Patents. Although Fuji joined in Canon's initial motion presenting the ownership defense, after this motion was denied by the Court Fuji decided not to pursue it.

Ultimately, the claims against Canon and Fuji were tried to separate juries, both of which found in favor of St. Clair. During trial in the *Canon* Action, it was disclosed that Canon had entered into a Consulting Agreement and Covenant Not to Sue ("Consulting Agreement") with Mirage. (D.I. 77 at Exh. 6.) Proceedings before a Special Master followed to determine if sanctions were warranted against Canon for its untimely production of the Consulting Agreement. The Special Master found that the Consulting Agreement resulted in a payment to Mirage of at least $167,693.97 in exchange for Mirage's cooperation and assistance to Canon in asserting the ownership defense, including "providing testimony in Court." The Special Master recommended several sanctions against Canon and its counsel, including the dismissal of its ownership defense, payment of attorneys' fees and costs, court fines, and revocation of the pro hac vice applications of Canon's attorneys and their law firm. Shortly after the Special Master's Report and Recommendation was submitted to Judge Farnan, Canon settled with St. Clair and

4

waived its right to challenge St. Clair's ownership of the Roberts Patents.

The ownership defense was raised a second time by another defendant in an action that had been filed by St. Clair on November 9, 2004, *St. Clair v. Samsung Electronics Co. Ltd., et al.*, Civ. Action No. 04-1436-JJF (the "*Samsung* Action"). In the *Samsung* Action, St. Clair alleged infringement of the Roberts Patents against Samsung Electronics Co. Ltd., Samsung Electronics America Inc., Samsung Telecom America LLP (the "Samsung entities"), Matsushita Electric Industrial Co., Ltd., Panasonic AVC Networks Company, Matsushita Electrical Corporation of America, Victor Company of Japan LTD, JVC Americas Corporation, JVC Company of America, Nokia Corporation, Nokia Mobile Phones, Nokia Inc., Hewlett-Packard Co., Eastman Kodak Co., Panasonic Corporation of America, Panasonic Corporation, Panasonic Corporation of North America, AT&T Mobility Corp., and AT&T Mobility LLC.[2] After St. Clair filed the *Samsung* action, Mirage filed suit against St. Clair and the Inventors of the Roberts Patents in the Superior Court of California, County of Santa Clara, claiming that Mirage owned the Roberts Patents (the "California Action"). One month later, Kodak, a defendant in the *Samsung* Action, entered into an agreement with Mirage to purchase Mirage's alleged rights to the Roberts Patents. Kodak was substituted for Mirage in the California Action. The *Samsung* Action was stayed pending resolution of the ownership defense in the California Action.

Ultimately, the California Action was settled through a binding Memorandum of Understanding among St. Clair, Kodak, and Mirage. (D.I. 77, Exh. 10.) As part of the settlement, Kodak executed a Confirmation, which provides:

---

[2]On April 1, 2009, the Samsung entities entered into a Patent License Agreement with St. Clair, and the claims against them have been dismissed. (D.I. 247 in Civil Action No. 04-1436-JJF-LPS).

5

> Kodak hereby stipulates and now confirms that St. Clair Intellectual Property
> Consultants, Inc. . . . has been the lawful owner of and has had good title to the
> Roberts Patents since St. Clair's 1995 purchase of those patents from Personal
> Computer Camera, Inc.

(*Id.* at STCLR 001908.)  Kodak also stipulated that St. Clair had standing to file and invoke this

Court's subject matter jurisdiction upon the filing of the *Samsung* Action on November 9, 2004.

In addition, Mirage and Kodak executed documents, including the Kodak Confirmation, that

were filed with the PTO confirming that St. Clair owned the Roberts Patents.  (*Id.* at Exh. 11.)

Further, Kodak and Mirage executed Assignments providing that each entity "hereby sells,

assigns, transfers and conveys to [St. Clair] any and all such right, title, and interest" in the

Roberts Patents.  (*Id.*, Exh. 10 at STCLR 001909.)


## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a complaint if

the Court lacks subject matter jurisdiction over the plaintiff's claim, or the plaintiff lacks

standing to bring its claim.  Motions brought under Rule 12(b)(1) may present either a facial or

factual challenge to the Court's subject matter jurisdiction.  In reviewing a facial challenge under

Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply: the Court must accept all factual

allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.

In reviewing a factual challenge to the Court's subject matter jurisdiction, however, the

Court is not confined to the allegations of the complaint, and no presumption of truthfulness

attaches to the plaintiff's allegations.  *See Mortensen v. First Fed. Sav. and Loan*, 549 F.2d 884,

891 (3d Cir. 1977).  The Court may consider evidence outside the pleadings, including affidavits,

depositions, and testimony, to resolve any factual issues bearing on jurisdiction. *See Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997).

Pursuant to Rule 12(b)(3), subject matter jurisdiction may be challenged at any time during the course of a case and may be raised *sua sponte* by the Court. Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff "must bear the burden of persuasion" and establish that subject matter jurisdiction exists. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991).

## DISCUSSION

By their Motions To Dismiss, Defendants once again raise the ownership defense. Defendants do not contest that St. Clair has owned the Roberts Patents since its May 14, 2008 settlement with Kodak. However, Defendants contend that prior to that assignment, the patents were owned first by Mirage, as a result of the automatic assignment provision in the Inventors' Employment Agreements, and then by Kodak, based on Mirage's 2006 assignment of those patents to Kodak. On Defendants' interpretation, St. Clair did not own the patents at the time it commenced this action and, therefore, St. Clair lacks constitutional standing to pursue this action. If the Court cannot resolve this issue as a matter of law, Defendants alternatively request jurisdictional discovery in aid of establishing St. Clair's lack of standing prior to the resolution of the merits of this infringement action. In arguing that jurisdictional discovery is appropriate, Defendants contend that the Kodak settlement cannot have retroactively conferred standing on St. Clair. Defendants also contend that any statements Kodak made in the settlement papers confirming St. Clair's ownership of the patents are not binding upon the parties in this case.

In response, St. Clair contends that Kodak's Confirmation of St. Clair's ownership of the patents is dispositive of the ownership issue, relying upon the Federal Circuit's decision in *IP Venture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324 (Fed. Cir. 2007). St. Clair also claims that Kodak's Confirmation of St. Clair's ownership is consistent with the correct reading of the Mirage Employment Agreements, which do not include the present assignment language that would have been necessary to automatically transfer legal title of employee-conceived inventions to Mirage. St. Clair also raises several "defenses" to the ownership defense, including statute of limitations, laches, estoppel, waiver, and the patent recording statute. With respect to jurisdictional discovery, St. Clair asserts that I have already rejected Defendants' request by declining to adopt Defendants' proposal for a separate jurisdictional discovery period.

## I.    The Impact Of The Scheduling Order And Judge Farnan's Ruling On The 12(b)(1) Motion In The *Canon* Action

As a threshold matter, St. Clair contends that I have already rejected the notion that jurisdictional discovery should be permitted on the ownership defense by entering a Scheduling Order that does not provide for a separate period of jurisdictional discovery. St. Clair also contends that Defendants' Motions To Dismiss raise the precise issues rejected by Judge Farnan in his denial of the Rule 12(b)(1) motion in the *Canon* Action. I reject both of these contentions.

First, in entering the Scheduling Order, I expressly stated that I was not ruling on the pending Motions To Dismiss and that I was not foreclosing the possibility of jurisdictional discovery. Rather, my ruling was that all other discovery would not be stayed while a separate period for only jurisdictional discovery was carved out. As I explained:

> I'm not aware of anything that says I abuse my discretion
> by allowing [jurisdictional discovery] to happen at the same time
> as other discovery, or anything that requires me necessarily to
> resolve the jurisdictional motion before anything else in the case
> happens.
>
> So, while I'm not -- I'm not per se ruling on the motion [to
> dismiss] that was filed yesterday . . . and the scheduling order
> you're going to see -- I'm not breaking out a separate time period
> for jurisdictional discovery.

(D.I. 75, Tr. 12/8/08 at 24.)   Accordingly, the entry of a Scheduling Order in this case does not

moot my consideration of the instant Motions To Dismiss, including the request for jurisdictional

discovery contained therein.

Nor is Judge Farnan's decision to deny Canon's Rule 12(b)(1) motion in related litigation

dispositive here.  In that decision, Judge Farnan considered Canon's motion to be a facial attack

to the Court's subject matter jurisdiction.  (D.I. 77, Exh. 5 at 3.)  In so doing, Judge Farnan

accepted the factual allegations of the Complaint as true and concluded that St. Clair had made a

sufficient showing of ownership to avoid dismissal.  (*Id.*)  By contrast, this case presents a factual

challenge to the Court's subject matter jurisdiction, and, in such cases, there is no requirement

that the allegations of the Complaint be accepted as true.  Instead, the Court may look beyond the

pleadings to such extrinsic evidence as affidavits, depositions, and testimony.  Accordingly,

because the instant Motions present a different challenge to jurisdiction than that presented in the

*Canon* Action, I will not rely on Judge Farnan's decision in the *Canon* Action to make

recommendations regarding the disposition of these Motions.

## II.   The Impact Of The Kodak's Confirmation

Defendants argue that St. Clair cannot use the Kodak Confirmation to confer standing

9

retroactively.  Defendants further assert that the Kodak Confirmation was made in the context of

a settlement agreement between Kodak and St. Clair and, therefore, it is not binding on third

parties.  Relatedly, Defendants insist that the Kodak Confirmation has little evidentiary value

under Fed. R. Evid. 408 and principles pertaining to the use of statements made in compromise

negotiations.

St. Clair responds that the Federal Circuit's decision in *IP Venture* requires the Court to

accept the Kodak Confirmation as dispositive proof that St. Clair has owned the Roberts Patents

since 1995.  St. Clair further contends that the Kodak Confirmation was made part of the public

record of the Assignment Branch of the USPTO independently of the Settlement Agreement,

rendering statements contained in it admissions and not merely compromises made during

settlement negotiations.  Thus, according to St. Clair, Fed. R. Evid. 408 and its principles do not

apply.

In reply, Defendants attempt to distinguish *IP Venture* on the grounds that it addressed

the ability to cure prudential standing, whereas the instant case involves questions of St. Clair's

constitutional standing.  Because constitutional standing cannot be cured after a plaintiff has filed

suit, Defendants contend that *IP Venture* is not applicable here.

Standing to sue is a constitutional prerequisite to maintaining an action in federal court.

To establish standing in accordance with Article III of the Constitution, the party bringing the

action must demonstrate: (1) an injury in fact (an invasion of a legally protected interest that is

concrete and particularized and actual or imminent); (2) a causal connection between the

defendant's action and the injury (that the injury is fairly traceable to the defendant's alleged

unlawful conduct); and (3) redressability (that the injury is likely to be redressed by the relief

requested). *See Hein v. Freedom Religion Found., Inc.*, 127 S. Ct. 2553, 2555-2556 (2007);

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). Article III standing must be

present at the time the party brings suit, *see Lujan*, 504 U.S. at 570 n. 5, and cannot be conferred

by agreement of the parties, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998).

In contrast, "a plaintiff with constitutional standing may cure prudential standing defects

after it files suit." *See VirnetX, Inc. v. Microsoft Corp.*, 2008 U.S. Dist. LEXIS 94854, at *7

(E.D. Tex. June 3, 2008). Prudential standing "constitute[s] a supplemental aspect of the basic

standing analysis and address[es] concerns regarding the need for judicial restraint." *Oxford*

*Assoc. v. Waste Sys. Auth.*, 271 F.3d 140, 145 (3d. Cir. 2001) (internal citation omitted). In this

regard, the prudential limits of standing are used "to ensure that only those parties who can best

pursue a particular claim will gain access to the courts." *Id.* (internal citation omitted).

Prudential standing embraces the following principles:

> (1) the plaintiff generally must assert his own legal rights and interests, and cannot
> rest his claim to relief on the legal rights or interests of third parties; (2) even
> when the plaintiff has alleged redressable injury sufficient to meet the
> requirements of Article III, the federal courts will not adjudicate abstract questions
> of wide public significance which amount to generalized grievances pervasively
> shared and most appropriately addressed in the representative branches; and (3)
> the plaintiff's complaint must fall within the zone of interests to be protected or
> regulated by the statute or constitutional guarantee in question.

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 485 (3d Cir. 1998)

(internal quotation marks and citations omitted).

I have studied the Federal Circuit's decision in *IP Venture* and agree with Defendants that

it is not dispositive. In *IP Venture*, the Federal Circuit considered whether Hewlett-Packard, the

employer of a co-inventor of the patent-in-suit, had an ownership interest in the patent when the

11

action was filed and, if so, what effect Hewlett-Packard's disclaimer of its patent rights had on that ownership interest. The patent-in-suit was co-invented by a Hewlett-Packard employee and his father and then assigned to IP Venture, a company owned by the employee co-inventor and a third individual. Subsequent to the filing of the suit, Hewlett-Packard and IP Venture entered into an agreement in which Hewlett-Packard stated that it "never has had any legal or equitable rights" to the patent-in-suit. The Federal Circuit concluded that the district court should have considered Hewlett-Packard's statement for purposes of determining whether the employment agreement between Hewlett-Packard and the employee co-inventor had required the invention to be automatically assigned to Hewlett-Packard.

Notably, only one of the co-inventors of the patent was subject to the Hewlett Packard employment agreement. Therefore, IP Venture had acquired at least the rights of the non-employee co-inventor (i.e., the father) and was at least a co-owner of the patent, regardless of the effect of the Hewlett-Packard employment agreement on the other co-inventor's rights. As Defendants point out, this distinction is critical because, as at least a co-owner of the patent, IP Venture had constitutional standing to bring the action. The issue, then, concerned prudential standing: whether Hewlett-Packard was a co-owner of the patent and, hence, also a necessary party.

Unlike *IP Venture*, the instant case presents the question of St. Clair's constitutional standing in the first instance, not prudential standing. If the Roberts Patents were automatically assigned to Mirage, and hence never assigned to St. Clair (until the Kodak Confirmation), St. Clair had no legal interest in the Roberts Patents when it initiated the instant suit, and thereby St. Clair lacks constitutional standing. A lack of constitutional standing at the initiation of the suit

cannot have been retroactively remedied by the statements made in the Kodak Confirmation. *See Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005). Having concluded that the Kodak Confirmation is not dispositive on the ownership issue and that I must address the merits of the ownership defense, there is no need to determine the evidentiary value of the Kodak Confirmation under Fed. R. Evid. 408 and its associated principles.

## III.     Whether The Inventors' Employment Agreements Automatically Assigned The Roberts Patents To Mirage

Before addressing the substance of the Employment Agreements, I note that the parties agree that jurisdictional discovery is required only if the Employment Agreements are ambiguous. If the Employment Agreements are unambiguous, such that they can be construed as a matter of law, there is no need for jurisdictional discovery. (D.I. 158, Tr. 3/24/09 at 7, 29.) Of course, both parties further argue that the correct, unambiguous reading of the Employment Agreements favors their respective positions vis-à-vis St. Clair's ownership rights.

In this case, the critical question of ownership rights turns on whether the Employment Agreements contain present language of assignment such that the Roberts Patents can be said to have been automatically assigned to Mirage. However, before this question can be reached, I must determine which paragraphs of the Employment Agreements are applicable.

### A.     Whether Employee-Conceived Inventions Are Governed By Paragraphs 3 And 4 Or 5 And 6 Of The Employment Agreements

St. Clair does not dispute that paragraph 4 of the Employment Agreements contains present language of assignment. *See* D.I. 158, Tr. 3/24/09 at 40 (Plaintiff's counsel stating, "Paragraph 4 contains language of present assignment, it says hereby assigned"); *see also id.* at 37-38. Instead, St. Clair argues that paragraphs 3 and 4 only apply to proprietary information of

Mirage that is conveyed to its employees during their employment -- referred to in paragraphs 3 and 4 as "inventions" with a lower case "i" -- and not to inventions originating in the mind of the inventor, that is "employee inventions." According to St. Clair, "employee inventions" are specifically and unambiguously covered by paragraphs 5 and 6 of the Employment Agreements, where the term "Inventions" designated with a capital "I" is made a defined term. In St. Clair's view, paragraphs 5 and 6 of the Employment Agreements are unambiguous in their application to "employee inventions," and, consequently, govern this dispute. Further, in St. Clair's view, paragraphs 5 and 6 do not contain the required present language of assignment, so the Roberts Patents were not automatically assigned to Mirage. Thus, according to St. Clair, St. Clair has been the rightful owner of the Roberts Patents since their assignment to St. Clair in 1995.[3]

Defendants contend that paragraphs 3 and 4 unambiguously apply to all inventions, including employee-conceived inventions, and, because paragraph 4 contains present assignment language, the Roberts Patents were automatically assigned to Mirage by operation of the Employment Agreements. Defendants disagree with the distinction St. Clair makes between the term "inventions" with a lower case "i"and "Inventions" with a capital "I," insisting instead that paragraphs 5 and 6 "merely incorporate into the agreement the requirements in the description of the California Labor Code" and "merely modify the assignment obligations that are explicitly set forth in paragraphs 3 and 4, which include inventions by . . . employees." (Tr. at 11, 15-16.) Alternatively, Defendants contend that even if paragraphs 5 and 6 apply, paragraph 6 contains present assignment language sufficient to have effectuated the automatic assignment of the

---

[3]St. Clair argues, in the alternative, that if paragraphs 3 and 4 apply to "employee inventions," those provisions are unenforceable under the California Labor Code. Given my view that paragraphs 5 and 6 are applicable, I need not address this argument.

14

Roberts Patents to Mirage.

The question of which paragraphs apply to this dispute presents a question of general contract interpretation. Thus, I must turn to the applicable state law governing the contracts, here California law. Under California law, the goal of interpreting a contract is to ascertain the parties' intent. *See WDT-Winchester v. Nilsson,* 27 Cal. App. 4th 516, 527 (Cal. Ct. App. 1994). In this regard, the language of the contract governs so long as it is clear and explicit. Cal. Civ. Code § 1638. Interpretation of contract language is guided by the ordinary and popular usage of the words used in the agreement, unless a contrary intent is shown. Cal. Civ. Code § 1644; *Salton Bay Marina, Inc. v. Imperial Irrigation Dist.*, 172 Cal. App. 3d 914, 931 (Cal. Ct. App. 1985). Stated another way, "if the meaning a layperson would ascribe to contract language is not ambiguous," then that meaning is applied. *Santisas v. Goodin*, 951 P.2d 399, 405 (Cal. Ct. App. 1998). Contract language should be interpreted to avoid redundancy and absurdity and to give effect to every clause. *See* Cal. Civ. Code § 1641; *ACL Tech., Inc. v. Northbrook Property & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, 1784-1785 (Cal. Ct. App. 1993); *General Precision, Inc. v. International Ass'n of Machinists*, 241 Cal. App. 2d 744, 746-747 (Cal. Ct. App. 1966).

A contract is considered ambiguous only if it is capable of two or more constructions, both of which are reasonable. *See Muzzi v. Bel Air Mart*, 171 Cal. App. 4th 456 (Cal. Ct. App. 2009). An interpretation is unreasonable if it renders the contractual language meaningless or superfluous. *See Hard v. California State Employees Ass'n.*, 112 Cal. App. 4th 1343, 1347-1348 (Cal. Ct. App. 2003); *see also In re Marriage of Fischer*, 2008 WL 3875359 (Cal. Ct. App. Aug. 21, 2008); *Bradner v. Vasquez*, 227 P.2d 559, 562 (Cal. Ct. App. 1951). Only if the contract language is ambiguous may extrinsic evidence be considered to ascertain its meaning. *See*

15

*Golden West Baseball Co. v. City of Anaheim,* 25 Cal. App. 4th 11, 21 (Cal. Ct. App. 1994).

In full, the disputed provisions of the Employment Agreements provide:

> 3. I understand that my employment by MIRAGE creates a relationship of confidence and trust between myself and MIRAGE with respect to any information of a proprietary nature that I may become aware of during the period of my employment by MIRAGE and which (a) relates to the business of MIRAGE or to the business of any customer or supplier of MIRAGE, or (b) has been created, discovered, or developed by, or has otherwise become known to MIRAGE, and has commercial value in the business in which MIRAGE is engaged (hereinafter called "Proprietary Information"). By way of illustration but not limitation, Proprietary Information includes trade secrets, processes, formulas, computer programs, data, know-how, inventions, improvements, techniques, marketing plans, strategies, forecasts, and customer lists.

> 4. All Propriety Information shall be the sole property of MIRAGE and its assigns. I hereby assign to MIRAGE any rights I may have or acquire to all Proprietary Information. I will keep in confidence and trust all Proprietary Information at all times, both during my employment and after its termination, and I will not use or disclose any Proprietary Information without the written consent of MIRAGE except as may be necessary in the ordinary course of performing my duties as an employee of MIRAGE. In the event of the termination of my employment by me or by MIRAGE for any reasons, I will promptly deliver to MIRAGE all documents and data of any nature containing Proprietary Information and I will not take with me any such documents or data or any reproductions thereof.

> 5. I will promptly disclose in confidence to MIRAGE or any persons designated by it all inventions, improvement, original works of authorship, formulas, processes, computer programs, techniques, know-how, and data, whether or not patentable or copyrightable made or conceived or first reduced to practice or learned by me either alone or jointly with others during the period of my employment (hereinafter collectively called "Inventions").

> 6. I agree that all such Inventions which MIRAGE in

16

> its sole discretion determines to be related to or useful in the
> business or research or development of MIRAGE, or which result
> from work performed by me for MIRAGE, shall be the sole and
> exclusive property of MIRAGE and its assigns and MIRAGE shall
> have the right to use and/or to apply for patents, copyrights or other
> statutory or common law protections for such inventions in any or
> all countries. I further agree to assist MIRAGE in every proper
> way (but at MIRAGE's expense) to obtain, and from time to time
> to enforce, patents, copyrights, and other statutory or common law
> protections therefore, and in enforcing the same, as MIRAGE may
> desire, together with any assignments thereof to MIRAGE or to
> persons designated by MIRAGE. My obligations under this
> Paragraph 6 shall continue beyond the termination of my
> employment with MIRAGE, but MIRAGE shall compensate me at
> a reasonable rate after such termination for time actually spent by
> me at MIRAGE's request on such assistance.

(D.I. 77, Exh. 18 at 4-6 (emphasis added).)

Reading the plain language of these provisions from the point of view of a layperson so as

to give full and harmonious effect to the Employment Agreements as a whole, I conclude that

there is no ambiguity, and that the Employment Agreements plainly require paragraphs 5 and 6 to

apply to "employee inventions," while paragraphs 3 and 4 pertain to proprietary information

belonging to Mirage. In this regard, I am persuaded by the distinction drawn by St. Clair

between "inventions" as used in paragraphs 3 and 4 and "Inventions" used in paragraphs 5 and 6.

The term "inventions" with a lower case "i" is included in paragraph 3 as an example of what

constitutes "Proprietary Information." Among the defined characteristics of "Proprietary

Information" are that it is something that the employee "become[s] aware of" during the course

of his employment, indicating that it is information Mirage may have developed prior to the

employee's employment; it is something that did not originate in the employee's mind but,

instead, came to be known by the employee during and as a result of his employment. On the

17

other hand, paragraph 5 deals with information the employee must himself "disclose" to Mirage because it was "made or conceived or first reduced to practice or learned by [the employee] either alone of jointly with others during the period of [the employee's] employment." Here, the focus is plainly on information, including inventions, made or conceived by the employee.

Defendants suggest that paragraphs 3 and 4 embrace all inventions, including employee-conceived inventions, and that paragraphs 5 and 6 are merely "an attempt to limit the material that is included within proprietary information" under paragraphs 3 and 4, so as to carve out from paragraphs 3 and 4 employee-conceived inventions, thereby ensuring compliance with Section 2870 of the California Code. (Tr. at 53.) In my view, however, Defendants' interpretation is not a reasonable reading and renders paragraphs 5 and 6 of the Employment Agreements superfluous. If paragraphs 3 and 4 were meant to embrace all inventions, paragraphs 5 and 6 would not be needed. Furthermore, paragraph 7 (which would also be superfluous under Defendants' interpretation) expressly refers to (and recites in capital letters) the provisions of Section 2870, emphasizing "that the provisions of Paragraph 6 . . . do not apply to an invention which qualifies fully" under Section 2870. That paragraph 7 expressly refers to paragraph 6, and not paragraph 4, shows again that paragraph 4 was not meant to include employee-conceived inventions.[4]

_____

[4]At the hearing, it was noted that paragraphs 8 and 15 of the Employment Agreements use the word "inventions" with a lower case "i" to refer to inventions created or developed by the employee. However, these paragraphs clearly deal with "inventions" that were developed by the employee "prior to [his] employment with Mirage" (emphasis added). Accordingly, I see no tension with the Agreements' use of "inventions" in paragraph 4. In fact, the presence of paragraphs 8 and 15 highlights that the drafters of the Employment Agreements were more sensitive to employee-created inventions, whether conceived before or during employment, and hence those inventions were parceled out in four different paragraphs rather than lumped together with all other inventions in paragraph 4 as Defendants contend.

18

In sum, I conclude that the construction proffered by Defendants of the term "invention" as used in paragraphs 3 and 4 is unreasonable, because it fails to give full effect to all provisions of the Employment Agreements and renders paragraphs 5 and 6 superfluous. Accordingly, I am not persuaded that the Employment Agreements are ambiguous. I further conclude that paragraphs 3 and 4 do not pertain to employee-conceived inventions. Rather, such inventions are governed by paragraphs 5 and 6 through the use of the defined term "Inventions."

**B.     Whether Paragraph 6 Contains Present Language Of Assignment**

Having determined that paragraphs 5 and 6 apply to employee-conceived inventions, I must next determine whether paragraph 6 contains the required present language of assignment to achieve what would have been an automatic assignment of the Roberts Patents to Mirage. "[T]he present assignment of a future invention divests the investor-assignor of ownership in the invention and automatically vests ownership of the invention, when invented, in the assignee." *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F. Supp. 2d 471 (S.D.N.Y. 2000). The question of whether a contract creates a present assignment is governed by federal law. *See DDB Technologies, L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). To determine if a contract creates a valid present assignment, the contractual language governs:

> [W]hether an assignment of patent rights in an agreement . . . is automatic, or merely a promise to assign, depends on the contractual language. If the contract expressly grants rights in future inventions, "no further act [is] required once an invention [comes] into being," and "the transfer of title [occurs] by operation of law." Contracts that merely obligate the inventor to grant rights in the future, by contrast, "may vest the promisee with equitable rights in those inventions once made," but do not by themselves "vest legal title to patents on the inventions in the promisee."

*Id.* at 1290 (internal citations omitted).

19

In *Arachnid, Inc. v. Merit Industries, Inc.*, the Federal Circuit concluded that language that provided that any inventions conceived "<u>shall be</u> the property of [the client], and all rights thereto <u>will be</u> assigned" by the contractor to the client, constituted an "agreement to assign, <u>not</u> an assignment." 939 F.2d 1574, 1576-80 (Fed. Cir. 1991) (emphasis added.). By contrast, in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000), the Federal Circuit concluded that a present assignment was effectuated by language which provided "that inventions 'shall belong' to Speedplay, and that Bryne 'hereby conveys, transfers and assigns' the inventions to Speedplay." The language in *Speedplay* was analogous to that at issue in *FilmTech Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1570 (Fed. Cir. 1991), in which a present assignment was effectuated when a contractor agreed "to grant and does hereby grant" to the client the rights and title to the invention. *See Speedplay*, 211 F.3d at 1253. By employing such language, "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *FilmTech*, 939 F.2d at 1573.

Here, the language used in paragraph 6 of the Employment Agreements is more closely aligned with the language of the *Arachnid* case than that involved in the *Speedplay* or *FilmTech* cases. Paragraph 6 provides that "all such Inventions . . . <u>shall be</u> the sole and exclusive property of Mirage . . . ." (D.I. 77 at ¶ 6 (emphasis added).) There is no language of present conveyance. *See, e.g. Speedplay*, 211 F.2d at 1253.

In addition, under paragraphs 5 and 6 several steps are required to effectuate an assignment even after an invention comes into being. For example, the employee must first disclose the invention to Mirage as provided for in paragraph 5. Then, under paragraph 6, Mirage must determine whether the invention is "related or useful in the business or research or

development of Mirage." Thereafter, the employee must "assist Mirage . . . to obtain . . . patents, copyrights, and other statutory or common law protections . . . together with any assignments thereof to Mirage or to persons designated by Mirage." (*Id.* (emphasis added).) These additional steps emphasize that the assignment contemplated in paragraph 6 does not occur automatically and inexorably by operation of law. *See FilmTech*, 939 F.2d at 1573; *see also Freedom Wireless, Inc. v. Boston Communications Group, Inc.*, 220 F. Supp. 2d 16, 19 (D. Mass. 2002) (holding that agreement which states "'all inventions belong . . . to the Company,' and which requires future acts by the inventor such as 'disclos[ing]' the invention and 'performing' action necessary to establish ownership is not sufficient to convey legal title to the invention").

In sum, I conclude that the language used in paragraph 6 of the Employment Agreements does not constitute a present assignment. Without such present language of assignment, the Roberts Patents were not automatically assigned to Mirage by operation of the Inventors' Employment Agreements. Therefore, the Employment Agreements do not present an impediment to St. Clair's ownership of the patents. Accordingly, St. Clair has been the owner of the Roberts Patents since their 1995 assignment to St. Clair.[5] Based on the foregoing conclusions, I recommend the denial of Defendants' Motions To Dismiss.

## RECOMMENDED DISPOSITION

For the reasons set forth above, I recommend that Kyocera's Rule 12(b)(1) Motion (1) For Jurisdictional Discovery And Hearing; And (2) To Dismiss For Lack Of Subject Matter

---

[5]Having reached this conclusion, I need not address the remaining "defenses" raised by St. Clair to the ownership defense.

21

Jurisdiction (D.I. 61) be DENIED, and the Motion To Dismiss For Lack Of Subject Matter

Jurisdiction (D.I. 72) filed by the remaining Defendants be DENIED.

The Motion For Leave To File A Surreply is GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B), Fed. R.

Civ. P. 72(b)(1), and D. Del. L.R. 72.1. The parties may serve and file specific written objections

within ten (10) days after being served with a copy of this Report and Recommendation. Fed. R.

Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the

right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-879

(3d Cir. 1987); *Simcavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).

Dated: May 4, 2009

The Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE

22